AMOS C. FISLER, appellant,

*v.*

IDA M. FISLER, respondent.

[Submitted July 6th, 1915.   Decided November 15th, 1915.]

Where a wife has willfully deserted her husband and has obstinately persisted in repelling his solicitations to return to him, the refusal of the husband to have an interview in a room alone with her, when it was

not suggested by her that she might be induced at such interview to return to the home that he had provided, is no bar to his right to have a divorce from her.

---

On an appeal from a decree of the court of chancery advised by Advisory Master Norman Grey.

*Mr. William Harris,* for the appellant.

*Messrs. Scovel & Harding,* for the respondent.

The opinion of the court was delivered by

TERHUNE, J.

This is an action for divorce by a husband upon the ground of the wife's desertion. Desertion to prove effective must possess three well-recognized essentials. It must be willful, continued and obstinate. The principal question to be answered in this case is whether after the desertion had occurred and during the statutory period of two years preceding the filing of the petition, the desertion lost the third or last necessary characteristic by the refusal of the petitioner to grant his wife a personal interview in some private place where the two could be alone together. The advisory master, who heard the case, concluded from the testimony as follows:

"I report that under these facts and circumstances the defendant was guilty of desertion; that she left her husband without cause, and refused to live with him in a proper home supplied by him for them both, and that such desertion was willful."

In this conclusion of the advisory master we concur.

He further reported, however, as follows: "That the petitioner has not performed the duty required of him by the law; that he should even, though his wife deserted him, seek her out and endeavor to persuade her to return to him and at least disclose to her a continuing desire on his part that she should resume marital relations with him."

The parties to the suit lived in Camden county and were married in 1907. He was twenty-two years and his wife eighteen years of age. No children were born of the marriage. After living in various places they took in the spring of 1912 apartments in Philadelphia. It is not necessary to record in this opinion the family differences of this young couple. He was a traveling man engaged in a business which kept him for long periods away from home. She appears to have been a pleasure loving young woman, self-reliant, dependent upon his business energies for her support, but not upon his society for her happiness. He heard rumors of her absence from home and attentions paid her that annoyed him. Matters continued more or less unsatisfactory, until one Saturday, in the latter part of June, 1912, he returned home unexpectedly after an absence of some six weeks. On his arrival she informed him that she had arranged to go to the shore the next day with some girls, that as there were to be no men in the party, he would be out of place. He spent this Sunday with his people, his wife, according to his testimony, reaching home between eleven and twelve o'clock at night. While it developed that during this trip the wife for a part of the time at least was in the company of a young man, there is no proof of any improper relations, and the only significance in referring to the incident is the part it no doubt played in influencing and hastening the husband's determination to give up the apartment in Philadelphia, and thereby remove his young wife during his periods of absence from the influence of strangers having no interest in her moral welfare, and place her where, if so inclined, she could have the benefit of his and her own families' influence. A few days after this incident he informed her that in view of the fact that his business kept him so much away from home, he proposed giving up the Philadelphia apartment. He thereupon induced his mother to move from a fifteen-dollar per month house on Linden street, Camden, to a new house with all modern conveniences on the same street, commanding a rent of $28 per month. He engaged two front rooms in this house, with the use of a bath, and furnished the same with the furniture taken from the Philadelphia apartment. He arranged that they could either take their meals with

his mother, get them themselves, or go outside for them. When his wife objected to going with him to this home on the ground that she did not want to live in the same house with his mother, he informed her that the arrangement might prove only temporary; that he did not want her to be entirely alone during his many and prolonged absences from home; that if conditions proved congenial they could continue to live there, and if not, he agreed to move any time she might so desire. He further urged her to come with him there at least until he could secure a permanent position in Philadelphia or Camden where he could be home with her nights. In his endeavors to influence her he had his sister, Minnie E. Fisler, early in July, 1912, call on her. She testified: "I told her to come over. We would do all in our power to make her happy," &c. She replied, "That she would think it over, but that she thought it would be better for him to go his way and she would go her way." In addition to this his mother sent her small daughter, Florence, over with a note urging her to come. She sent word back that she would think the matter over. She maintained this unresponsive attitude until about July 15th, 1912, this being the day they moved from the Philadelphia apartment. She then informed her husband that she had decided to go to her mother's home; that she would not go with him. This she did. For the next three or four nights he sought out his wife at her mother's house and pleaded with her to come home with him. She refused. About this time his business called him to Buffalo. He conceived the idea of taking her with him, hoping while on the trip he might prevail upon her upon their return to come home and live with him. They remained away ten days, and were apparently happy, but on the return to Camden she again refused to go with him, giving as her reason that she would not live in a house occupied by his mother. This was about the 16th or 17th of August, 1912. For the next three or four days after the return from this trip, petitioner again sought out his wife at her mother's house, and sincerely endeavored to persuade her to live with him under the arrangements before indicated. She refused, and the final parting ensued. Clearly, under the circumstances, considering the situation of the husband and the disposition of the wife, the

home offered by him was a suitable and proper one for temporary purposes, at least. He, realizing that she had left him with a fixed determination not to return, and that any effort on his part to induce her to return would prove futile, abandoned further effort. With the exception of some formal letters relating to the method of paying the weekly allowance which he voluntarily made her, there was no further communication between the couple until probably the month of May, 1913, and this brings us to what apparently was responsible for the advisory master's final conclusion in the case, the interview heretofore referred to in this opinion.

In the spring of 1913, probably, the month of May, the defendant met the petitioner at the ferry, in Camden, on his return from his business in Philadelphia. The meeting, although arranged by her, was entirely unexpected by him. They walked up Cooper street together. She asked him if he intended to put her in the home he had promised. He denied having promised her anything of the kind. He said that his home was still open. He requested her to come there, saying that in view of the fact that he was away from home so much it would be more congenial and pleasant for her there. She restated her position, stating that she would not come to live with his mother. She then asked for a personal interview alone with him, stating that she had something important to say to him. He refused this request, but told her that if she had anything to say, to tell him there on the street, or write him a letter. When asked by the advisory master why he refused such an interview, he stated in substance that he was unwilling to be alone with her lest something might occur that would make it necessary for a new period of two years to run from that time. Whether it was incumbent upon the petitioner upon this occasion to grant his wife's request to be alone with him for the purpose of an interview depends upon whether she gave him any evidence at the time, of a change of mental attitude in the matter. A careful analysis of the testimony shows that she did nothing of the kind. On the contrary, she prefaced her request by a reiteration of her original position. She did not in any way disclose, make manifest or give him reason to believe that he could overcome her original fixed determination not to

live with him except upon her own terms, but rather made it apparent to him that a renewal of his former efforts would prove futile and unavailing. Had she changed her attitude she could have ended this case then and there by simply tendering herself ready and willing to accept his proposal and live with him in the home he had prepared for her. Her husband knew that she had previously taken the advice of counsel; that she was carrying out some preconceived plan. He realized that she could write or talk with him there in the open with the same degree of privacy, so far as their conversation being overheard was concerned, as in a private room.

Looking at this meeting at the ferry from all standpoints, we can discover nothing that altered the legal status of the parties to this suit. The rule in this class of cases is laid down in the case of *Hall* v. *Hall, 60 N. J. Eq. 469; 46 Atl. Rep. 866*. The opinion in this case by Chief-Justice Gummere holds: "That a desertion, in order to be obstinate, must be persisted in against the willingness of the injured party to have it concluded is declared by all our cases; and, ordinarily, when the husband has, by his conduct toward his wife, contributed in any degree to her original desertion, the law requires that he should evidence that willingness by making such advances or concessions to his wife as might be reasonably expected to induce her to return to him.

"But the law does not impose this duty upon the husband in every case arbitrarily and without regard to the facts and circumstances by which it is surrounded. The husband is bound to make such advances and concessions only where there is reasonable ground to suppose that such action on his part will terminate the wife's desertion. Where it is manifest from the circumstances under which the desertion took place, or from her temper and disposition, or from any other fact in the case, that honest effort on the husband's part to terminate the separation would be unavailing; or, if successful in bringing the desertion to an end, would be so only temporarily, the duty of making it does not exist." See, also, *Rogers* v. *Rogers, 81 N. J. Eq. 479.*

In the light of the above opinion, we conclude that the petitioner was justified in refusing a private interview, which, while

it offered no hope of a reconciliation, did suggest an interruption of the continuity of the statutory period.

The above views lead to a reversal of the decree below and the granting of a final decree of divorce to the petitioner and the appellant.

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, VREDENBURGH, WHITE, TERHUNE, HEPPENHEIMER, WILLIAMS, TAYLOR—15.